**Patrick E. Mahoney**, ISB #5242
**Jennifer Reid Mahoney**, ISB #5207
**MAHONEY LAW, PLLC**
Capitol Gateway Plaza
1211 W. Myrtle Street, Suite 350
Boise, Idaho 83702
Telephone: (208) 345-6364
Facsimile: (208) 342-4657
*patrick@patrickmahoneylaw.com*
*jrm@patrickmahoneylaw.com*

**Attorneys for the Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| S.L.L., C.J.L, C.A.L., and H.E.L, surviving minor children of Elizabeth Leiker (deceased), by and through their legal guardian, CATHY L. FERNSTEDT (individually and in her representative capacity),<br><br>        Plaintiffs,<br><br>vs.<br><br>SAINT ALPHONSUS MEDICAL CENTER – NAMPA, INC.; CEP AMERICA, LLC and CEP AMERICA-IDAHO, LLP (both doing business in Idaho as "VITUITY"); JARED G. O'CONNOR, P.A.; and DOES I-X,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COME NOW, the above-captioned Plaintiffs, by and through their counsel of

record, and for their Complaint against Defendants state and allege as follows:

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

## JURISDICTION, PARTIES, AND VENUE

1.      This is a case of egregious medical malpractice leading to the wrongful death of Elizabeth Leiker ("Ms. Leiker," "the deceased," or "the patient"), who, at age 36, died on August 29th, 2020 from complications of severe yet preventable bacterial meningitis.  Ms. Leiker left behind her children - four young boys - and her mother, the boys' grandmother, who now cares for the boys.  Saint Alphonsus personnel and P.A. O'Connor failed to diagnose Ms. Leiker's serious medical condition, and instead improperly discharged her when it was medically unsafe to do so, resulting in her untimely death.

2.      Plaintiffs have appropriately complied with the Idaho State Board of Medicine's pre-litigation screening panel process pursuant to Idaho Code §6-1001 *et seq.*, and it has been at least 30 days since its Advisory Opinion was issued.

3.      Plaintiffs S.L.L., C.J.L., C.A.L., and H.E.L. are the surviving minor children of the deceased, Ms. Leiker.  They reside in Clackamas County, Oregon under the care and custody of their grandmother, the mother of the deceased, Plaintiff Cathy L. Fernstedt.  Plaintiff Fernstedt is a legally appointed guardian of said minor children.

4.      Defendant Saint Alphonsus Medical Center – Nampa, Inc. ("Saint Alphonsus") is an Idaho corporation with its address on file with the Idaho Secretary of State being in Nampa, Idaho.  Saint Alphonsus was where the subject patient care at issue took place.  Saint Alphonsus was the employer of nurses and other hospital employees and was the principal of various hospital agents for whose

negligent and reckless conduct Saint Alphonsus is liable under the doctrines of *respondeat superior*, and all applicable forms of agency, in addition to its independent culpability.

5. On information and belief, Saint Alphonsus contracted with a California-based physician staffing group doing business in Idaho as "Vituity." Vituity holds itself as being "one of the largest providers of acute care management and staffing solutions in the nation" and lists Saint Alphonsus as being a Vituity location. Vituity is registered with the Idaho Secretary of State as a d/b/a for Defendant CEP America-Idaho LLP *and* Defendant CEP America, LLC. Defendant CEP America-Idaho LLP is registered with the Idaho Secretary of State as a Limited Liability Partnership, an Idaho entity, and Defendant CEP America, LLC is registered with the Idaho Secretary of State as a foreign limited liability company, a Delaware entity. Emeryville, California is listed as the address on file with the Idaho Secretary of State for both CEP America-Idaho, LLP, and Defendant CEP America, LLC, and is the location listed by Vituity as its headquarters.

6. Defendant Jared O'Connor, P.A., was at all times relevant hereto a physician's assistant licensed as such in Idaho, residing in Idaho, and providing services at Saint Alphonsus. P.A. O'Connor's "Delegation of Services Agreement" on file with the Idaho Board of Medicine, and required by Idaho law as of the time of the care at issue in this case, lists his supervising physicians as being "Vituity" supervising physicians. Defendant CEP America-Idaho LLP and/or Defendant CEP America, LLC, either directly or under the auspices of "Vituity," are believed to

have employed P.A. O'Connor at all times relevant hereto. Said Defendants are vicariously liable for the conduct of P.A. O'Connor under the doctrines of *respondeat superior* and all applicable forms of agency. Defendant St. Alphonsus is vicariously liable for the conduct of P.A. O'Connor to the extent he was serving as its agent, as well as pursuant to the doctrines of apparent authority and/or apparent agency.

7.     Jurisdiction by way of diversity is proper in this Court pursuant to 28 U.S.C. §1332, as the parties to this action are citizens of different states and the amount in controversy exceeds the $75,000 jurisdictional minimum of this Court.

8.     Venue is proper pursuant to 28 U.S.C. §1391 as a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

9.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Does I through X, inclusive, and therefore sues those Defendants by such fictitious names. Plaintiffs are informed and believe, and on that basis allege, that the Defendants sued herein as Does I through X are in some manner legally culpable for the injuries and damages suffered by the Plaintiffs. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

## FACTS AND GENERAL ALLEGATIONS

10.     The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

11.     Bacterial meningitis is a serious medical condition requiring prompt diagnosis and intravenous antimicrobial therapy, first empiric then tailored, in

addition to administration of corticosteroid.  Meningitis is an inflammatory disease of the tissues surrounding the brain and spinal cord.  Severe headache, neck pain, fever, and altered mental status are considered the classic presenting symptoms of acute bacterial meningitis.  Acute bacterial meningitis should be promptly suspected in adults who present with a stiff neck, headache, fever, and/or altered mental status.  The most unique of these symptoms is neck pain because it, in the absence of trauma, may otherwise be inexplicable.

12.    In this case, the providers missed the diagnosis of meningitis despite the presence of the most basic, accepted, universally taught red flags in cases like this: neck pain when a patient tries to move their chin downwards to their neck, more technically referred to as meningeal irritation upon passive or active flexion of the neck resulting in an inability to touch the chin to the chest.    The critical diagnostic test for suspected meningitis is a laboratory examination of cerebrospinal fluid (CSF) obtained via lumbar puncture. The standard of care is to obtain CSF analysis via lumbar puncture for adult patients suspected of having meningitis. The CSF is then promptly examined in the hospital's laboratory for the presence of bacteria while broad-spectrum intravenous antibiotics are administered and, if positive, tailored intravenous therapy is then immediately started along with adjunct medical therapies.

13.    A missed diagnosis of meningitis resulting in a delay of treatment can be fatal, as it was here.  The Centers for Disease Control lists headache, neck pain, and fever as the top symptoms of meningitis.  Also included in the known list of

symptoms is altered mental status.  With these symptoms, healthcare providers must have a high index of suspicion for meningitis and a low threshold to proceed with a lumbar puncture.  If the provider suspects meningitis, the standard of care is to rule that out via lumbar puncture for CSF analysis.  Consistently, the Joint Commission instructs that hospital emergency departments should have policies, procedures, and strategies for identifying and diagnosing meningitis.

14.   On Sunday afternoon, August 16th, 2020, the Canyon County Ambulance District responded to a 911 call at 1405, directing them to the Nampa Inn & Suites.  There they found 36-year-old Elizabeth Leiker (5 ft. 1 in., 102 lbs.) on her side in bed.  Ms. Lieker and her two children were in town for a funeral, having traveled by car from their home in Estacada, Oregon.  One of the children (the oldest, then age 13) had called the grandmother to report that their mother was in pain and was acting strangely.  The grandmother directed the boy to call 911 immediately because he reported that his mother was acting very strangely and was complaining about severe neck pain and headache.  In the paramedic's report, the documented signs and symptoms include neck pain, headache, and fever.  Ms. Leiker was reported lucid and reported a recent ear infection. By the paramedics' exam, Ms. Leiker had cervical pain on range of motion, "*Pt reports increased pain in her neck and back along the spine and at the base of her neck when she tries to bring her chin to her chest and/or her knees up to her chest*." "*She reports that pain in her neck and back increases when she flexes her neck downward or draws her legs up to her chest*" at a pain level consistent with "*childbirth*."   Ms. Leiker was

assisted with standing and walking to a stretcher, and she requested that she be taken to the nearest hospital. The paramedics transported Ms. Leiker into the Saint Alphonsus in Nampa at 1440 by ambulance, having administered her Fentanyl and Zofran en route (although the patient indicated reluctance in that she reported that narcotics typically make her nauseous), whereupon they transferred her from the stretcher to a hospital bed by slide transfer.

15.   At 1444, the Saint Alphonsus triage nurse documented that the patient had arrived by ambulance with the following chief complaints, "Severe headache, neck pain, unable to touch chin to chest, cough." The patient's temperature was noted to be 99.9 deg, slightly elevated. Ms. Leiker was then seen by PA Jared O'Connor at 1503. In an Emergency/Urgent Care record (not signed by him until two days later, on 8/18/2020), P.A. O'Connor documented the patient's chief complaint as "*Severe headache, neck pain, unable to touch chin to chest, cough.*" "*With her headache, she reports having neck pain and states that she has difficulty with certain range of motion with her neck.*" "*[S]tates that her headache is bilateral and severe at time of ED evaluation, states that she has pain in her neck…never had symptoms like this previously….*" The patient's headache had worsened to a level of severe pain.

16.   Despite the documentation of neck pain with an inability to touch her chin to her chest, PA O'Connor wrote, in his record signed two days later, that the patient's neck was supple, with no nuchal rigidity, and no meningeal signs. Likewise, despite the EMS documentation of complaints of fever and the nurse

documentation of the patient consistently yelling until medications were given, PA O'Connor wrote that the neurological exam was normal, that the patient was calm, cooperative, and appropriate, and that the patient denied fever. PA O'Connor ordered a drug toxicology screen, a CBC and CMP, lipase, a chest x-ray, and a head CT.   The toxicology screen was negative (apart from the pain medication administered by the EMS), chest x-ray and ECG were all normal.  The head CT was normal, but for nonspecific paranasal sinus opacification, the radiological differential for which is very broad such that clinical correlation was recommended. PA O'Connor also ordered a pregnancy test and a chlamydia test, which were negative. The patient was negative for Covid 19.  However, the laboratory results showed an increased level of white blood cells at 14.85, flagged as high, "H." Correspondingly, the patient's neutrophils were high.  As such, there were elevated white blood cells with a shift towards immature (new) white blood cell forms. Lumbar puncture and blood cultures were *not* ordered or performed.

17.   Upon P.A. O'Connor's orders, Ms. Leiker was administered Compazine (by injection), Benadryl, Tylenol, Decadron, and two injections of Dilaudid (hydromorphone).  The medication administration record reveals an approach of pain medication with injected sedatives followed by powerful pain medication injections, including at discharge (with the patient having already been administered Fentanyl and Zofran in the ambulance by the EMS):

             1424:  Zofran (EMS)
             1430:  Fentanyl (EMS)
             1544:  Tylenol
             1545:  Benadryl injection

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

1546:  Compazine injection
1823:  Tylenol
1848:  Decadron
1918:  Dilaudid injection
1933:  Dilaudid injection

18.    P.A. O'Connor documented that the findings were not consistent with an ear infection.  He wrote that the patient might have sinusitis, despite a complete lack of any clinical correlation by way of facial tenderness, observed nasal congestion, observed respiratory findings, or the like.  The ear, nose, and throat exam was normal, and there was no respiratory distress, chest breath sounds were clear, and there were no wheezes.  He noted what he described as mild leukocytosis, that her symptoms improved some in the ER, but that she had headache recurrence when he examined her and documented that her headache had worsened.  With no mention or explanation whatsoever of the chief complaint of neck pain and inability to touch chin to neck documented by EMS, the ER nurse, *and himself*, P.A. O'Connor wrote:

> At this time do not suspect acute infectious spinal process, suspect patient symptoms due to viral syndrome she does not have meningismal signs on exam and does not appear toxic, given instructions for close follow-up with PCP and expressed understanding with return to ED precautions.

19.    At 1530, Nurse Schubert documented that the patient's behavior was "***Agitated" and "Inappropriate***."  At 1606, Nurse Schubert noted that EMS brought the patient in with her two children.  She reported that the patient had been consistently "***yelling***" and using the call light until medications were given, but that she was then sleeping soundly.  At 1823, she documented that the patient's pain

score was "7".   At 1853, Nurse Schubert noted in the patient's medical records that the children were noisy, very active, had things on the floor in the room, and had several juices and crackers:

> Children very active.   Things all over the floor in the room.
> Have had several juices and crackers during the visit.   Have
> been asked multiple times to lower the noise level in the room.

20.   The patient's pain was a "9" at 1918 (12 minutes before discharge) after which Nurse Schubert administered a Dilaudid injection, and a "5" at 1929, as per documentation by Nurse Bingham, followed by yet another Dilaudid injection by Nurse Schubert at 1933.   Although Nurse Schubert took time to document that the young boys were being loud and messy and had juice and crackers, she failed to mention the patient's neck pain at all.

21.   The Emergency Department Discharge Summary, at 1931, repeats the patient's chief complaint as "***Severe headache, neck pain, unable to touch chin to chest, cough.***"   This record states that the patient had a general headache "without cause" and sinusitis.   No clinical correlation whatsoever for sinusitis is documented or reported.   Nonetheless, Ms. Leiker was prescribed pain medication and antibiotics for sinusitis, described by PA O'Connor as a "viral syndrome."   She was given patient education pamphlets on general headaches without cause, viral syndrome, and sinusitis.   Ironically, tragically so, the sinusitis pamphlet instructs patients to "**GET HELP RIGHT AWAY**" if "**You have a stiff neck**."   Having had symptoms severe enough that she had arrived by ambulance on a stretcher, Ms. Leiker was required to take a taxi with her children back to the hotel.

22.     That evening, Ms. Leiker called her mother and briefly told her that she had been to the hospital and they had given her some medication and sent her on her way.  Her mother reports that she sounded as if she was disoriented, drunk, or had been drugged.  Ms. Leiker told her mother that she was just going to try to drive home back to Oregon.  Her mother told her not to try to drive and that she would come to get her.  The following day, Monday, August 17th, 2020, Ms. Leiker's mother drove with a friend from Oregon to Idaho to pick up her daughter and grandchildren and drove the family back home to Oregon.

23.     The next morning, 8/18/2020, Ms. Leiker's symptoms had worsened, and her mother brought her to the emergency room at Kaiser Permanente at 0930, approximately 36 hours after she was discharged from St. Alphonsus.  She presented with headache, neck pain, and altered mental status.  The top of the charted differential diagnosis upon Ms. Leiker's admission at Kaiser Permanente was, of course, meningitis.  Accordingly, a lumbar puncture was performed that, not surprisingly, came back positive for gram-positive cocci on the gram stain of her cerebral spinal fluid.  Ms. Leiker was diagnosed with fulminant meningitis.  She was rapidly deteriorating, becoming non-responsive, and required intubation.  Antibiotics were ordered and administered.  She underwent immediate neurosurgery for attempted alleviation of intracranial pressure.  Despite the healthcare team's efforts at Kaiser Permanente, it was too late; Ms. Leiker had severe bacterial meningitis and was septic.  Over the following week, there was no evidence of higher neurological function, a grim prognosis was given, and she was

placed on comfort supportive care with mechanical ventilation.  Ms. Leiker passed
away and was determined entirely brain dead on 8/29/2020, leaving behind her four
young boys and mother.

24.    Here, meningitis was considered but ruled out *without* a lumbar
puncture.  This was despite the massive red flag that was one of the patient's three
chief complaints: neck pain upon trying to move her chin down towards her neck, a
symptom that was clearly documented in the records by the EMS, and RN, and the
PA himself: "unable to touch chin to chest."  This is inexcusable and is an egregious
violation of the standard of care.

The providers somehow failed to recognize that one does not need ambulance
transport to the hospital on a stretcher for sinusitis, and that sinusitis does not
require multiple injections of narcotic pain medication and sedatives.  Although a
drug test was ordered, a lumbar puncture was not.  Although a chlamydia test was
ordered, a lumbar puncture was not.  Although a pregnancy test was ordered, a
lumbar puncture was not.  And, although there is a detailed discussion in the
patient's record of noisy and messy children, there is no analysis of the patient's
inability to touch her neck to her chest.

The patient was heavily sedated and then administered narcotic pain
medication at discharge to achieve a lower pain level (a 5 down from 9).  Ms. Leiker
was discharged with there being no clinical correlation for the vaguely diagnosed
condition of sinusitis, and was given antibiotics for a presumed "viral syndrome."
Consequently, the patient was discharged, having been given a Dilaudid injection

literally upon release, with a material risk of deterioration of her medical condition, which not surprisingly occurred over the next 36 hours, whereby her condition became non-survivable as a direct and proximate result of the missed diagnosis and the resulting delay in proper treatment.

## MEDICAL NEGLIGENCE – WRONGFUL DEATH

25.    The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

26.    The medical care and lack thereof described above constitutes malpractice, was negligent, reckless, grossly negligent, and failed to meet the applicable standards of healthcare practice.  Without limitation, P.A. O'Connor and the Saint Alphonsus nurses clearly misdiagnosed the patient's serious medical condition, ignoring obvious red flags for meningitis.  P.A. O'Connor failed to order key diagnostic testing.   The Saint Alphonsus nurses improperly injected the deceased, as an unstable patient, with powerful narcotic pain medication at the time of discharge rather than identify a nursing diagnosis, work to substantively stabilize the patient, and treat the underlying condition.   The Saint Alphonsus nurses failed to properly advocate for the patient, particularly since there was not an adult family member or family friend who could take physical custody of the patient when she was obviously still suffering from a serious medical condition which ultimately resulted in her untimely death.  The Saint Alphonsus nurses and P.A. O'Connor failed to meet the applicable standard of care by prematurely

releasing the patient to her own care at a time when she was clearly in no condition to travel on her own with her minor children.

27.     Additionally, and/or alternatively, discovery, investigation, and the evidence in this case may show that Saint Alphonsus violated the standard of care to the extent that it failed to have proper, current hospital policies and procedures as to the above issues of care. Alternatively, to the extent such hospital policies and procedures did exist at the time, discovery, investigation, and the evidence in this case may show that said Defendant violated the standard of care by failing to train, educate, supervise and monitor its personnel, employees, nursing staff, and agents as to the same.

28.     Defendants' conduct, and that of their agents and employees, was reckless such that the statutory cap on general damages set forth in Idaho Code §6-1603 should be lifted.

29.     The medical malpractice described above was a direct and proximate cause of, and a substantial factor in causing, the wrongful death of Ms. Leiker and thus the loss of the Plaintiffs' mother/daughter. The Plaintiffs have suffered, and will continue to suffer, the wrongful loss of their mother/daughter, mental and emotional pain, suffering, and distress, mental anguish, loss of consortium, and loss of enjoyment of life. The minor boys will now grow up without their mother. A mother's daughter has pre-deceased her. Medical bills were incurred for the related pre-death treatment Ms. Leiker. Funeral expenses and incidental expenses were incurred relative to her wrongful death. The minor boys have suffered, and will

continue to suffer, a loss of income for the family.  As such, Plaintiffs are entitled to an award of damages for all allowable general and special damages.

30.     Plaintiffs reserve the right to seek an amendment to this Complaint to add a claim for punitive damages.

### DEMAND FOR ATTORNEY FEES

31.     As a result of the Defendants' conduct complained of herein, the Plaintiffs have been required to retain the services of legal counsel to represent their interests in this matter.  Pursuant to Idaho Code §12-121, Rule 54 of the Federal Rules of Civil Procedure, the Defendants are liable to the Plaintiffs for their reasonable attorney fees and litigation costs.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants as follows:

a.     All allowable general damages, including, without limitation, monetary amounts that fully compensate each of the four Plaintiffs for the loss of their mother/daughter, in amounts to be determined at trial;

b.     All allowable special damages, including, without limitation, monetary amounts that compensate Plaintiffs for loss of income from the deceased, medical expenses for the related pre-death medical treatment of the deceased, funeral costs, and incidental expenses related to the death of the deceased, in amounts to be determined at trial;

COMPLAINT AND DEMAND FOR JURY TRIAL - 15

c.      Plaintiffs' reasonable attorney fees and costs incurred in the prosecution of this action, or $10,000 should this matter proceed by default; and

d.      Such other and further relief as this Court deems just and equitable.

**DATED** this 15th day of August, 2022.

MAHONEY LAW, PLLC

By /S/ Patrick E. Mahoney
PATRICK E. MAHONEY
Attorney for the Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by a jury, pursuant to FRCP 38, on all issues so triable.

**DATED** this 15th day of August, 2022.

MAHONEY LAW, PLLC

By /S/ Patrick E. Mahoney
PATRICK E. MAHONEY
Attorney for the Plaintiffs